IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
CLARKSBURG DIVISION

```
FILED

JUL 2 9 2002

U.S. DISTRICT COURT
CLARKSBURG, WV 26301
```

**ROBERT HART**,

      Plaintiff,

v.

**THE CHRISTIAN BROADCASTING
NETWORK, INC., AMERICAN CENTER
FOR LAW AND JUSTICE, INC., JON
GIGLIOTTI**, individually, and **JOHN
STEPANOVICH**, individually,

      Defendants.

CIVIL ACTION NO. 1:02cv73

---

**MOTION TO DISMISS ON BEHALF OF DEFENDANTS THE CHRISTIAN
BROADCASTING NETWORK, INC., AMERICAN CENTER FOR LAW
AND JUSTICE, INC., AND JOHN STEPANOVICH**

---

COME NOW, the Defendants, The Christian Broadcasting Network, Inc. ("CBN"),

American Center for Law and Justice, Inc. ("ACLJ"), and John Stepanovich, by counsel,

Charles J. Crooks and April Min, Jackson & Kelly PLLC, and move this Honorable Court,

pursuant to Federal Rule of Civil Procedure 12 (b)(6), to dismiss the complaint in this action

because it fails to state a claim upon which relief can be granted.  In support of their motion

to dismiss, the Defendants incorporate the attached memorandum of law.

Respectfully submitted,

**THE AMERICAN CENTER FOR LAW
AND JUSTICE, INC., THE CHRISTIAN
BROADCASTING NETWORK, INC., and
JOHN STEPANOVICH**

By Counsel.

Charles J. Crooks, Esquire
WV State Bar I.D. No. 4633
April Min, Esquire
WV State Bar I.D. No. 7750
**JACKSON & KELLY PLLC**
Post Office Box 619
Morgantown, WV  26507-0619
*Telephone:*  (304) 284-4111
*Facsimile:*  (304) 284-4140

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
CLARKSBURG DIVISION

FILED

JUL 2 9 2002

U.S. DISTRICT COURT
CLARKSBURG, WV 26301

**ROBERT HART**,

    Plaintiff,

v.

CIVIL ACTION NO. 1:02cv73

**THE CHRISTIAN BROADCASTING
NETWORK, INC., AMERICAN CENTER
FOR LAW AND JUSTICE, INC., JON
GIGLIOTTI,** individually, and **JOHN
STEPANOVICH,** individually,

    Defendants.

---

**MEMORANDUM IN SUPPORT OF MOTION TO DISMISS
ON BEHALF OF DEFENDANTS THE CHRISTIAN
BROADCASTING NETWORK, INC., AMERICAN CENTER
FOR LAW AND JUSTICE, INC.,  AND JOHN STEPANOVICH**

COME NOW the Defendants, The Christian Broadcasting Network, Inc. ("CBN"),

American Center for Law and Justice, Inc. ("ACLJ"), and John Stepanovich, by counsel,

and in support of their motion to dismiss, state as follows:

## I. STATEMENT OF FACTS AND PROCEDURAL HISTORY

On or about April 22, 2002, the Plaintiff filed an original complaint in this action in

the Circuit Court of Monongalia County.  A summons and complaint were served on the

above-named Defendants through the West Virginia Secretary of State's Office on April 29,

2002, were forwarded to the Defendants, and were accepted on May 2, 2002.[1]

The Defendants removed this action to the District Court for the Northern District of West Virginia on May 29, 2002 on the basis of diversity jurisdiction. The Defendants also filed an answer to the complaint in the District Court on May 29, 2002.

The ACLJ is a non-profit organization which provides legal services, advice and counsel to clients, and support to attorneys involved in defending the religious and civil liberties of Americans. Defendant CBN is a non-profit corporation that provides television programming through cable, broadcast and satellite for the purposes of providing spiritual and religious information and support to the public. At all times pertinent to the Plaintiff's allegations, Mr. Stepanovich was deputy chief counsel for the ACLJ.

The Plaintiff generally alleges what can be interpreted as West Virginia common law breach of contract claims against the Defendants. The Plaintiff alleges that Jon Gigliotti, as an agent for the ACLJ and Mr. Stepanovich, promised the Plaintiff legal representation to investigate and prosecute "criminal and civil RICO actions in the federal courts against the State, Judge Larry Starcher, and the attorneys involved in the state condemnation actions," which appears to include a prior condemnation action in which the Plaintiff was a party.[2] The Plaintiff also alleges that Mr. Gigliotti, on behalf of Defendant

---

[1] Although a summons and complaint was also served upon the remaining Defendant, Jon Gigliotti, through the West Virginia Secretary of State's Office on April 29, 2002, there is no record of receipt of the summons and complaint and no return of service has been filed with the Secretary of State's Office. Accordingly, all references to "the Defendants" in the text of this memorandum shall be exclusive of Mr. Gigliotti unless stated otherwise.

[2] See Plaintiff's complaint at paragraphs 8 and 22. The Defendants have asserted in their answer that Mr. Gigliotti was not associated with them at any time pertinent to the Plaintiff's allegations, and thus was not their agent. The Defendants recognize that for the purposes of this motion, the Plaintiff's allegations must be taken as true.

CBN, promised to air a ninety-minute segment on the Christian Broadcasting Network in which the information about Plaintiff's condemnation action would be included.[3]

The Defendants have answered the Plaintiff's complaint, denying the Plaintiff's allegations. The Defendants specifically deny that Mr. Gigliotti was ever associated with the ACLJ or Mr. Stepanovich as their servant, employee or agent, and further deny that Mr. Gigliotti was associated with CBN as its servant, employee, or agent, at any time pertinent to the allegations in the Plaintiff's complaint.[4] The Defendants have further asserted any contractual defenses available to them, that no attorney/client relationship, nor agreement for representation, ever existed, and that the Defendants never promised or contracted to publicize the Plaintiff's grievances.[5]

The Defendants now move the Court to dismiss the Plaintiff's civil action, pursuant to Federal Rule of Civil Procedure 12(b)(6).

## II. ARGUMENT

A. **The Plaintiff's complaint must be dismissed because there is no set of facts which could support his claim and it is certain he is entitled to no relief.**

---

However, the Defendants maintain their position with respect to Mr. Gigliotti's status and in no way waive that defense by any argument presented here.

[3] See Plaintiff's complaint at paragraph 25; see footnote 2, supra.

[4] See Answer and Affirmative Defenses to Plaintiff's Complaint on Behalf of Defendants American Center for Law and Justice, Christian Broadcasting Network, and John Stepanovich.

[5] See Id.

The Defendants have moved to dismiss the Plaintiff's complaint for failure to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6). Dismissal of the Plaintiff's complaint is appropriate under F.R.C.P. 12(b)(6) if "'it appears to be a certainty that the plaintiff would be entitled to no relief under any state of facts which could be proven in support of its claim.'" Booth v. Old National Bank, 900 F.Supp. 836 (N.D.W.Va. 1995) (citations omitted).  For the purposes of a motion to dismiss, the Court must accept the factual allegations in the complaint as true.  See Id.  Further, the complaint is construed in a light most favorable to the Plaintiff and a dismissal should be granted where "the allegations raised in the complaint clearly demonstrate that plaintiff does not have a claim and that no set of facts would support plaintiff's claim."  Id. at 840 (citation omitted).

When the complaint is viewed in a light most favorable to the Plaintiff, it does not establish any claim against the Defendants for breach of contract or otherwise.[6]

**B.    The Plaintiff's claims fail to state a cause of action because the allegations do not establish the elements necessary to create an enforceable contract.**

The essence of the Plaintiff's claims against the Defendants appears to be breach of contract.  These claims fail against each of the Defendants primarily because any alleged promises made to the Plaintiff lacked the necessary elements to convert them into

---

[6] *Pro se* complaints are held to a less stringent standard of scrutiny than those drafted by attorneys.  See Morris v. Gulley, 527 F.Supp. 322 (N.D.W.Va. 1981).  Every effort has been made in this memorandum to bear this in mind and interpret the complaint as reasonably as possible.  As will be demonstrated in this memorandum, however, even under this more lenient standard, the Plaintiff's claims fail to state a cause of action.

enforceable contracts.    Specifically, the Plaintiff fails to demonstrate or allege any consideration for the alleged promises.  The claims against CBN and ACLJ/Stepanovich will be separately analyzed below.

### 1.    **Consideration**

The Plaintiff's claims against all defendants fail because any alleged promises lacked consideration; therefore, no contracts were ever created.  "A contract is a promise or a set of promises for the breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty."  Restatement (Second) of Contracts, §1.  In order for a promise to be legally enforceable, it must therefore have the necessary elements that transform the promise into a contract, including consideration.  "No promise is good in law unless there is a legal consideration in return for it."  Thomas v. Mott, Syl. Pt. 1, 74 W.Va. 493 (1914).

Consideration is an essential element of a contract which has been defined as "some right, interest, profit, or benefit accruing to one party, or some forbearance, detriment, loss, or responsibility given, suffered, or undertaken by another.  A benefit to the promissor or a detriment to the promisee is sufficient consideration for a contract."  Cook v. Heck's, Inc., 342 S.E.2d 453, 459 (W.Va. 1986) (internal citations omitted).

To constitute consideration, a performance or a return promise must be bargained for. See Restatement (Second) of Contracts, §71.  "A performance or return promise is bargained for if it is sought by the promissor in exchange for his promise and is given by

the promissee in exchange for that promise." Id.

The fact that a promise was given does not necessarily mean that a contract was made. For example, the Supreme Court of Minnesota, in its analysis of a contract dispute, offered insight into the doctrine of consideration as a test to determine the enforceability of promises:

> Consideration requires that a contractual promise be the product of a bargain. However, in this usage, "bargain" does not mean an exchange of things of equivalent, or any, value. It means a negotiation resulting in the voluntary assumption of an obligation by one party *upon condition of an act or forbearance* by the other. Consideration thus ensures that the promise enforced as a contract is not accidental, casual, or gratuitous, but has been uttered intentionally as the result of some deliberation, manifested by reciprocal bargaining or negotiation. In this view, the requirement of consideration is no mere technicality, historical anachronism, or arbitrary formality. It is an attempt to be as reasonable as we can in deciding which promises constitute contracts.

Bachr v. Penn-O-Tex Oil Corp., 104 N.W.2d 661 (Minn. 1960) (emphasis added).

On this foundation of the basic principles of consideration necessary to establish an enforceable contract, the individual claims against the Defendants can thus be analyzed.

2.    **CBN**

       a.    CBN cannot be compelled to air the Plaintiff's grievances as a matter of constitutional law.

The Plaintiff's claims against CBN fail first and foremost as a matter of fundamental constitutional law, without the necessity of proceeding to the failure of the Plaintiff's claim

6

of breach of contract.

A media outlet has a First Amendment right of free press to determine that which it will publish or air. See Miami Herald Publishing Co. v. Tornillo, 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974). Accordingly, a federal court cannot constitutionally compel a media outlet to publish information submitted to it if that outlet chooses not to do so. See Id.; see also Cook v. Advertiser Co., 458 F.2d 1119 (5th Cir. 1972) (Wisdom, J., concurring). This fundamental concept of free press has been discussed and upheld on a number of occasions by the United States Supreme Court. See e.g., Associated Press v. United States, 326 U.S.1 (1945); Branzburg v. Hayes, 408 U.S. 665 (1972); Columbia Broadcasting System, Inc. v. Democratic National Committee, 412 U.S. 94 (1973). Therefore, no court can compel CBN to air the Plaintiff's grievances if it chooses not to, absent an express agreement.

There is also support for the concept that even if the Plaintiff could make a prima facie case of a contract between himself and CBN, such a contract could not be constitutionally enforced. Courts in both the Fifth and Sixth Circuits have commented that even if a media outlet were to promise to publish a particular item of news, citizens do not have a contractual right to have material published and any such a promise could not be constitutionally enforced. See Cook, 458 F.2d at 1123 (Wisdom, J., concurring); Groswirt v. Columbus Dispatch, 2000 U.S. App. LEXIS 33466 (Dec. 13, 2000 6th Cir.)

(unpublished).[7]  As Judge Wisdom stated in Cook,

> It is more accurate to describe a newspaper's "promise"
> to publish any particular item as a "promise" that is conditioned
> on the newspaper's informed discretion as to what is news - and
> one which is plainly so understood by the public. ... [I]t is well
> understood by all who furnish information to a newspaper that
> the object of their efforts may or may not come to fruition, and
> that it will be left to the informed choice of the paper's editors.
> In short, I would say that the "offer" for a unilateral "contract"
> communicated by the [newspaper] is an offer to publish on such
> terms as it sees fit.  It is an offer to exchange only an
> unenforceable promise to publish.

Cook, 458 F.2d at 1123 - 24.

Accordingly, even if the Plaintiff were able to make a prima facie case that a contract

existed between he and CBN, such a contract would necessarily be unenforceable under the

First Amendment to the United States Constitution.

      b.    The Plaintiff's breach of contract claim against CBN also fails
because there was no consideration for any alleged promise.

Even if the Plaintiff could arguably enforce a contract with CBN to publicize, the

Plaintiff has set forth no set of facts which would establish the existence of such a contract.

Even viewing the Plaintiff's complaint in a light most favorable to him, the allegations

demonstrate no consideration for any of the alleged promises asserted by the Plaintiff.

An assessment of the Plaintiff's complaint demonstrates that the only viable

allegation contained in it against CBN with respect to any alleged promises made by that

---

[7] A copy of this opinion is attached hereto as an addendum, pursuant to 4th Cir. L.R. 36(c) and 28(b).

organization is contained in paragraphs 25 and 32 of the complaint.[8]  The one viable allegation contained in the Plaintiff's complaint is that contained in paragraphs 25 and 32 in which it is alleged that Mr. Gigliotti promised that CBN would air a ninety-minute segment on its Christian Broadcasting Network regarding Mr. Hart's condemnation action. Paragraph 25 specifically alleges that Mr. Gigliotti "gave his word and did promise" that CBN would air the segment.  Even taking this allegation as true, such a promise by Mr. Gigliotti cannot constitute a legally enforceable promise, much less a contract.

Consideration requires that a performance or a return promise must be bargained for, which can consist of an act other than a promise, or a forbearance.  See Restatement (Second) of Contracts, §71.  In this case, there is clearly no bargained-for exchange.  Even if Mr. Gigliotti promised to air a segment, the complaint alleges no exchange of promises or performances.  The Plaintiff alleges no act or forbearance on his part in exchange for the promise alleged to have been made by Mr. Gigliotti.  Mr. Hart did nothing to his detriment; CBN received no benefit.  Without such a bargained-for exchange, no enforceable promise nor contract has been sufficiently alleged in the Plaintiff's complaint.  Accordingly, the Plaintiff's claims against CBN fail to state a cognizable cause of action and must be dismissed.

---

[8] The Plaintiff recites numerous allegations in the complaint in which he includes CBN; however, all of these allegations are inapplicable to CBN.  Numerous paragraphs allege specific promises with respect to the prosecution and investigation of civil and criminal actions against various persons and entities.  However, as a television broadcast company, CBN is neither a legal organization nor a government agency with the authority to prosecute civil or criminal actions.  Therefore, any such allegations against CBN are not sustainable.

3.    **ACLJ and John Stepanovich**

The Plaintiff's complaint also fails to allege a cause of action against the ACLJ and Mr. Stepanovich. "The relationship of attorney and client is a matter of contract, express or implied." State ex rel. DeFrances v. Bedell, 446 S.E.2d 906 (W.Va. 1994). Accordingly, the Plaintiff's complaint must allege a legally enforceable contract to survive a motion to dismiss.

The Plaintiff's complaint makes a number of allegations, but the essence of his complaint is that Mr. Gigliotti promised the Plaintiff legal representation from the ACLJ and Mr. Stepanovich, its employee. Specifically, the Plaintiff alleges that the ACLJ and Mr. Stepanovich would "prosecute criminal and civil RICO actions in the federal courts without any cost whatsoever accessed [sic] against any potential client that they agree to represent."[9] Many of the Plaintiff's allegations relate to a wholly-separate civil action involving the "Lemley family," in which Mr. Stepanovich and others did provide some form of legal counsel to Mrs. Lemley. The purpose of the inclusion of this case in the Plaintiff's present complaint is unknown to the Defendants; however, a thorough reading of the complaint demonstrates that there are no allegations regarding any breaches of duty regarding Mrs. Lemley's civil action. Moreover, the Plaintiff's own claims against the Defendants set forth in the complaint are not related to the Lemley civil action. Therefore, these paragraphs are irrelevant and unrelated to Mr. Hart's claims.

_____

[9] See Plaintiff's complaint at paragraph 8.

10

The remaining allegations in the complaint against the ACLJ and Mr. Stepanovich attempt to identify at length a promise allegedly made by Mr. Gigliotti to investigate and prosecute civil and criminal RICO actions against the State of West Virginia, Judge Larry Starcher (now Justice Starcher of the West Virginia Supreme Court of Appeals) and attorneys involved in state condemnation actions. Again, after parsing through the many superfluous paragraphs of the complaint, the essence of the Plaintiff's complaint is an alleged promise for legal representation.

The Plaintiff's allegation that there was a promise made on behalf of the ACLJ and Mr. Stepanovich to provide him legal representation also fails because there was no consideration for such a promise. Again, a promise for legal representation, as any other promise, requires consideration in order to be legally enforceable. Even viewing the Plaintiff's allegations as true, the Plaintiff has demonstrated no bargained-for exchange which would constitute sufficient consideration to render the promise legally enforceable. At best, assuming Mr. Gigliotti was an agent of the ACLJ and/or Mr. Stepanovich, and assuming that Mr. Gigliotti did in fact promise that the ACLJ and Mr. Stepanovich would prosecute civil and criminal RICO actions against the various named parties, such a promise is not enforceable.

First, the Plaintiff's complaint demonstrates no benefit to the ACLJ and Mr. Stepanovich. Typically, in an enforceable agreement to provide legal representation, the attorney is benefited by receiving monetary compensation for his services. In this case, there is no allegation that Mr. Hart paid or promised to pay any monetary compensation to

11

the Defendants.   To the contrary, Mr. Hart first alleges that representation would be gratuitous, done without any cost whatsoever to the clients.[10] Mr. Hart then contradicts this allegation by saying that Mr. Gigliotti gave his word that a contingency of no more than twenty percent would be taken by the ACLJ and Mr. Stepanovich.  However, there is no allegation that Mr. Hart agreed to pay *any* contingent fee, much less one of twenty percent.[11]

In fact, the only mention of any exchange of money for services contained in the Plaintiff's complaint is found in paragraph 13.  In paragraph 13, Mr. Hart indicates that Mr. Gigliotti promised him that the only money "up-front" would be for Mr. Gigliotti's fees to investigate.  The Plaintiff goes on to describe a number of steps taken by Mr. Gigliotti to investigate the Plaintiff's claims, such as meeting with the Plaintiff and others, reviewing certain documents regarding a state condemnation action, reviewing audiotapes, reviewing a copy of the appeal the Plaintiff presented to the United States Supreme Court, speaking with a local news reporter, and touring the Monongalia County Courthouse.[12]  Clearly, Mr. Hart received the benefit of his bargain; he paid Mr. Gigliotti to investigate and Mr. Gigliotti appears to have investigated, as the facts set forth in the Plaintiff's complaint demonstrate.   There is no further discussion or allegation that Mr. Hart paid any compensation to the ACLJ or Mr. Stepanovich, or that he ever promised to pay such compensation to either of these Defendants.

---

[10] See Plaintiff's complaint at paragraph 8.

[11] See Plaintiff's complaint at paragraph 9.

[12] See Plaintiff's complaint at paragraphs 18, 20, and 26.

In addition, there is no other allegation contained in the complaint which demonstrates any bargained-for exchange between Mr. Hart and the ACLJ and Mr. Stepanovich. Again, even taking the Plaintiff's allegations as true, the Plaintiff's complaint alleges at best a promise by Mr. Gigliotti to secure legal representation for the Plaintiff. However, even if Mr. Gigliotti made such a promise, without consideration such a promise is not enforceable. "[T]he fact that a promise was given does not necessarily mean that a contract was made. It is clear that not every promise is legally enforceable." Baehr, 104 N.W.2d at 665. Even if the ACLJ and Mr. Stepanovich had agreed to take Mr. Hart's case on a pro bono basis, such a promise would not necessarily be legally enforceable. While such a promise could be made, without consideration it is not a legally enforceable promise. The Plaintiff's complaint in the present action establishes no consideration or bargained-for exchange between the parties. Without such consideration, any promise allegedly made is not legally enforceable. Accordingly, the Plaintiff's claims against the ACLJ and Mr. Stepanovich must be dismissed.

**C.     The Plaintiff's claims against the Defendants fail because any alleged agreement does not comport with the statute of frauds.**

Finally, even if a contract could be found in the allegations contained in the complaint, any such contract cannot be upheld because it does not comport with the requirements of the statute of frauds.

West Virginia Code §55-1-1 codifies the long-standing doctrine known as the statute

of frauds.  It states, in pertinent part, that "[n]o action shall be brought ... [u]pon any

agreement that is not to be performed within a year ... [u]nless the offer, promise, contract,

agreement, representation, assurance, or ratification, or some memorandum or note thereof,

be in writing and signed by the party to be charged thereby or his agent." W.Va. Code §55-

1-1 (f) (2000 Repl. Vol.).

> This clause of the statute applies to such contracts only
> as, under a fair and *reasonable* construction of their terms, do
> not admit of a valid performance within a year *in accordance
> with the intent of the parties*; and a contract whose terms do not
> expressly postpone performance beyond a year or contain
> anything inconsistent with complete performance within that
> period, is not within the statute, although it be likely or
> expected to extend over a longer period of time.

Reckley v. Zenn, 81 S.E. 565 (W.Va. 1914) (emphasis added).  Further, it is "necessary that

the contract be capable, *by reasonable construction*, of full performance by one side within

a year in order to remove it from the statute of frauds."  Thompson v. Stuckey, 300 S.E.2d

295 (W.Va. 1983) (citation omitted) (emphasis added).

Finally,

> [t]he surrounding circumstances of parties must be taken
> into consideration in construing a contract to determine whether
> it is not within the statute of frauds because of possibility of
> performance within one year, but the rule is confined to
> circumstances of parties at time contract was entered into, and
> does not relate to circumstances which arose   during
> performance of the contract.

Jones v. Shipley, Syl., 7 S.E.2d 346 (W.Va. 1940).

In the present case, it is somewhat difficult to assess from the Plaintiff's allegations

when a specific agreement to provide representation or publicity to Mr. Hart is alleged to have been made by Mr. Gigliotti, the ACLJ and/or Mr. Stepanovich, and/or CBN. With respect to any alleged contract for legal representation, the Plaintiff's complaint does not specifically allege that the ACLJ or Mr. Stepanovich agreed to represent Mr. Hart specifically; rather, the complaint merely alleges that the Defendants agreed to prosecute civil and criminal RICO actions.[13]  Paragraph 14 of the complaint does cite a specific promise to represent Mrs. Lemley. However, this obviously does not state a promise to Mr. Hart nor state a cause of action on behalf of Mr. Hart.

If the Plaintiff's complaint does in fact allege either a promise to represent Mr. Hart specifically, or a promise to publicize his grievances, it appears such a promise was initially made during the meeting Mr. Hart attended with Mr. Gigliotti on February 15, 1997.[14] However, if any such promises were made, those promises were modified during the subsequent meeting between Mr. Hart and Mr. Gigliotti on May 22, 1997.[15] As alleged in the Plaintiff's complaint, "Defendants Gigliotti and Stepanovich let the Plaintiff know that everything is on hold until President Clinton is either impeached or resigned from office."[16] Clearly, the complaint alleges verbal agreements to provide legal representation and publicity after such time as President Clinton was impeached or resigned from office. There

---

[13] See Plaintiff's complaint at paragraphs 8, 22, and 23.

[14] See Plaintiff's complaint at paragraphs 7 - 16, describing the meeting.

[15] See Plaintiff's complaint at paragraphs 33 - 36.

[16] Plaintiff's complaint at paragraph 36.

is no allegation in the complaint that any of these alleged promises were reduced to writing. As such, these unwritten promises do not comport with the statute of frauds.

If an oral promise contains anything inconsistent with complete performance within a year, the statute of frauds renders such a promise unenforceable. See Reckley, 81 S.E. at 565. Further, the contract must be capable, by *reasonable* construction, of full performance within a year. See Thompson, 300 S.E.2d at 298. In accordance with Shipley, a review of the surrounding circumstances at the time this alleged promise was made makes clear that any such contract could not have been performed within a year.

At the time of the alleged promise, May 22, 1997, an investigation into President Clinton's behavior had not yet been commenced. To the contrary, the Office of Independent Counsel did not even receive the information which lead to its investigation into President Clinton's behavior until January 12, 1998.[17] In light of the fact that there was not even an investigation into President Clinton's behavior at the time the alleged promises were made to Mr. Hart, there was no reasonable circumstance which would have indicated any potential for impeachment resulting in removal from office, or that President Clinton would resign. Moreover, the last time a U.S. president had been impeached was Andrew Johnson, who was acquitted on May 26, 1868.[18] The last time a president had resigned from

---

[17] See "Referral to the United States House of Representatives Pursuant to Title 28, United States Code, §595(c)," submitted by the Office of Independent Counsel, September 9, 1998, at "The Investigation," http://thomas.loc.gov/icreport/, attached hereto, in pertinent part, as Exhibit "A," at page 2 of 9.

[18] See Borgna Brunner, A Short History of Impeachment, www.infoplease.com/spot/impeach.html, attached hereto as Exhibit "B."

office was August 9, 1974, when President Nixon resigned amidst a scandal specifically related to his role as president, much different than the circumstances surrounding President Clinton's troubles.[19]  Accordingly, there is no reasonable construction which would indicate that at the time the alleged promise was made, May 22, 1997, the parties contemplated that President Clinton would no longer be in office within a year from the time the alleged promise was made.

With that in mind, it is clear that the alleged contract could not have been performed within a year.  President Clinton was reelected to his second term in office in November, 1996, to serve a four-year term.[20]  That term expired upon the inauguration of President George W. Bush on January 20, 2001.  Accordingly, the earliest time that the alleged promises to Mr. Hart could have been performed was some three and a half to four years after the promises.  Furthermore, the Plaintiff's own conduct, as alleged in the complaint, demonstrates he did not regard the alleged promises as capable of performance within a year.  The Plaintiff took no action on the alleged promises until after President Clinton left office and President Bush was inaugurated.[21]  Judging from the Plaintiff's own conduct as reflected in the complaint, the Plaintiff clearly indicates he did not perceive the alleged promise could be performed within a year.

---

[19] See Biography of Richard M. Nixon, www.infoplease.com/ipa/A0760621.html, attached hereto as Exhibit "C."

[20] See "Key Dates," as included in the referral by the Office of Independent Counsel, supra, specifically found at http://thomas.loc.gov/icreport/3chron.htm, attached hereto as Exhibit "D."

[21] See Plaintiff's complaint at paragraph 40.

Because the alleged promises were not in writing, and were not capable of performance within a year from the date the promises were alleged to have been made, they do not meet the requirements of the statute of frauds and are therefore unenforceable. Accordingly, the Plaintiff's complaint fails to state a cause of action against the Defendants and must be dismissed.

### III. CONCLUSION

WHEREFORE, the Defendants, The Christian Broadcasting Network, Inc., American Center for Law and Justice, Inc., and John Stepanovich, for the reasons set forth above, respectively request that this Court grant the present motion and enter an order dismissing this action, with prejudice, pursuant to F.R.C.P 12(b)(6), that the Court award any and all costs and fees as appropriate, and any such further relief as the Court deems appropriate.

Respectfully submitted,

**THE AMERICAN CENTER FOR LAW AND JUSTICE, INC., THE CHRISTIAN BROADCASTING NETWORK, INC., and JOHN STEPANOVICH**

By Counsel.

Charles J. Crooks, Esquire
WV State Bar I.D. No. 4633
April Min, Esquire
WV State Bar I.D. No. 7750
**JACKSON & KELLY PLLC**
Post Office Box 619
Morgantown, WV  26507-0619
*Telephone:*  (304) 284-4111
*Facsimile:*  (304) 284-4140

M0369487.1

# Referral

## to the

## United States House of Representatives

## pursuant to

## Title 28, United States Code, § 595(c)

## Submitted by

## The Office of the Independent Counsel

## September 9, 1998

## <u>Table of Contents</u>

**EXHIBIT**

## Introduction

As required by Section 595(c) of Title 28 of the United States Code, the Office of the Independent Counsel ("OIC" or "Office") hereby submits substantial and credible information that President William Jefferson Clinton committed acts that may constitute grounds for an impeachment.[1]

The information reveals that President Clinton:

lied under oath at a civil deposition while he was a defendant in a sexual harassment lawsuit;

lied under oath to a grand jury;

attempted to influence the testimony of a potential witness who had direct knowledge of facts that would reveal the falsity of his deposition testimony;

attempted to obstruct justice by facilitating a witness's plan to refuse to comply with a subpoena;

attempted to obstruct justice by encouraging a witness to file an affidavit that the President knew would be false, and then by making use of that false affidavit at his own deposition;

lied to potential grand jury witnesses, knowing that they would repeat those lies before the grand jury; and

engaged in a pattern of conduct that was inconsistent with his constitutional duty to faithfully execute the laws.

The evidence shows that these acts, and others, were part of a pattern that began as an effort to prevent the disclosure information about the President's relationship with a former White House intern and employee, Monica S. Lewinsky, and continued as an effort to prevent the information from being disclosed in an ongoing criminal investigation.

## Factual Background

In May 1994, Paula Corbin Jones filed a lawsuit against William Jefferson Clinton in the United States District Court for the Eastern District of Arkansas.[2] Ms. Jones alleged that while he was the Governor of Arkansas, President Clinton sexually harassed her during an incident in a Little Rock hotel room.[3] President Clinton denied the allegations. He also challenged the ability of a private litigant to pursue a lawsuit against a sitting President. In May 1997, the Supreme Court unanimously rejected the President's legal argument. The Court concluded that Ms. Jones, "[l]ike every other citizen who properly invokes [the District Court's] jurisdiction . . . has a right to an orderly disposition of her claims," and that therefore Ms. Jones was entitled to pursue her claims while the President was in office.[4] A few months later, the pretrial discovery process began.[5]

One sharply disputed issue in the Jones litigation was the extent to which the President would be required to disclose information about sexual relationships he may have had with "other women." Ms. Jones's attorneys sought disclosure of this information, arguing that it was relevant to proving that the President had propositioned Ms. Jones. The President resisted the discovery requests, arguing that evidence of relationships with other women (if any) was irrelevant.

In late 1997, the issue was presented to United States District Judge Susan Webber Wright for resolution. Judge Wright's decision was unambiguous. For purposes of pretrial discovery, President Clinton was required to provide certain information about his alleged relationships with other women. In an order dated December 11, 1997, for example, Judge Wright said: "The Court finds, therefore, that the plaintiff is entitled to information regarding any

during the relevant time frame state or federal employees."[6] Judge Wright left for another day the issue whether any information of this type would be admissible were the case to go to trial. But for purposes of answering the written questions served on the President, and for purposes of answering questions at a deposition, the District Court ruled that the President must respond.

In mid-December 1997, the President answered one of the written discovery questions posed by Ms. Jones on this issue. When asked to identify all women who were state or federal employees and with whom he had had "sexual relations" since 1986,[7] the President answered under oath: "None."[8] For purposes of this interrogatory, the term "sexual relations" was not defined.

On January 17, 1998, President Clinton was questioned under oath about his relationships with other women in the workplace, this time at a deposition. Judge Wright presided over the deposition. The President was asked numerous questions about his relationship with Monica Lewinsky, by then a 24-year-old former White House intern, White House employee, and Pentagon employee. Under oath and in the presence of Judge Wright, the President denied that he had engaged in a "sexual affair," a "sexual relationship," or "sexual relations" with Ms. Lewinsky. The President also stated that he had no specific memory of having been alone with Ms. Lewinsky, that he remembered few details of any gifts they might have exchanged, and indicated that no one except his attorneys had kept him informed of Ms. Lewinsky's status as a potential witness in the Jones case.

### The Investigation

On January 12, 1998, this Office received information that Monica Lewinsky was attempting to influence the testimony of one of the witnesses in the Jones litigation, and that Ms. Lewinsky herself was prepared to provide false information under oath in that lawsuit. The OIC was also informed that Ms. Lewinsky had spoken to the President and the President's close friend Vernon Jordan about being subpoenaed to testify in the Jones suit, and that Vernon Jordan and others were helping her find a job. The allegations with respect to Mr. Jordan and the job search were similar to ones already under review in the ongoing Whitewater investigation.[9]

After gathering preliminary evidence to test the information's reliability, the OIC presented the evidence to Attorney General Janet Reno. Based on her review of the information, the Attorney General determined that a further investigation by the Independent Counsel was required.

On the following day, Attorney General Reno petitioned the Special Division of the United States Court of Appeals for the District of Columbia Circuit, on an expedited basis, to expand the jurisdiction of Independent Counsel Kenneth W. Starr. On January 16, 1998, in response to the Attorney General's request, the Special Division issued an order that provides in pertinent part:

The Independent Counsel shall have jurisdiction and authority to investigate to the maximum extent authorized by the Independent Counsel Reauthorization Act of 1994 whether Monica Lewinsky or others suborned perjury, obstructed justice, intimidated witnesses, or otherwise violated federal law other than a Class B or C misdemeanor or infraction in dealing with witnesses, potential witnesses, attorneys, or others concerning the civil case Jones v. Clinton.[10]

On January 28, 1998, after the allegations about the President's relationship with Ms. Lewinsky became public, the OIC filed a Motion for Limited Intervention and a Stay of Discovery in Jones v. Clinton. The OIC argued that the civil discovery process should be halted because it was having a negative effect on the criminal investigation. The OIC represented to the Court that numerous individuals then under subpoena in Jones, including Monica Lewinsky, were integral to the OIC's investigation, and that courts routinely stayed discovery in such circumstances.[11]

The next day Judge Wright responded to the OIC's motion. The Court ruled that discovery would be permitted to continue, except to the extent that it sought information about Monica Lewinsky. The Court acknowledged that "evidence concerning Monica Lewinsky might be relevant to the issues in [the Jones] case."[12] It concluded, however,



🖨**Print Now!**

this page was printed from Infoplease.com
http://www.infoplease.com/spot/impeach.html



# A Short History of Impeachment
*High crimes and misdemeanors*

by Borgna Brunner                                                     Send this Page to a Friend!

The right to impeach public officials is secured by the U.S. Constitution in Article I, Sections 2 and 3, which discuss the procedure, and in Article II, Section 4, which indicates the grounds for impeachment: "the President, Vice President, and all civil officers of the United States shall be removed from office on impeachment for, and conviction of, treason, bribery, or other high crimes and misdemeanors."

Removing an official from office requires two steps: (1) a formal accusation, or impeachment, by the House of Representatives, and (2) a trial and conviction by the Senate. Impeachment requires a majority vote of the House; conviction is more difficult, requiring a two-thirds vote by the Senate. The vice president presides over the Senate proceedings in the case of all officials except the president, whose trial is presided over by the chief justice of the Supreme Court. This is because the vice president can hardly be considered a disinterested party — if his or her boss is forced out of office he or she is next in line for the top job!



Ticket of admission to the U.S. Senate galleries for the impeachment trial of President Andrew Johnson *Source:*The Granger Collection

## What Are "High Crimes and Misdemeanors?"

Bribery, perjury, and treason are among the least ambiguous reasons meriting impeachment, but the ocean of wrongdoing encompassed by the Constitution's stipulation of "high crimes and misdemeanors" is vast. Abuse of power and serious misconduct in office fit this category, but one act that is definitely not grounds for impeachment is partisan discord. Several impeachment cases have confused political animosity with genuine crimes. Since Congress, the vortex of partisanship, is responsible for indicting, trying, and convicting public officials, it is necessary for the legislative branch to temporarily cast aside its factional nature and adopt a judicial role.

## The Infamous Sixteen

Since 1797 the House of Representatives has impeached sixteen federal officials. These include two presidents, a cabinet member, a senator, a justice of the Supreme Court, and eleven federal judges. Of those, the Senate has convicted and removed seven, all of them judges. Not included in this list are the office holders who have resigned rather than face impeachment, most notably, President Richard M. Nixon.

## The Small Fry

The first official impeached in this country was Senator William Blount of Tennessee for a plot to help the British seize Louisiana and Florida from Spain in 1797. The Senate dismissed the charges on Jan. 14, 1799, determining that it had no jurisdiction over its own members. The Senate and the House do, however, have the right to discipline their members, and the Senate expelled Blount the day after his impeachment.

Judge John Pickering of New Hampshire was the first impeached official actually convicted. He was found guilty of drunkenness and unlawful rulings, on March 12, 1804, and was believed to have been insane.

Associate Justice Samuel Chase, a strong Federalist, was impeached but acquitted of judicial bias against anti-Federalists. The acquittal on March 1, 1805, established that political differences were not grounds for impeachment.

Other officials impeached were implicated in bribery, cheating on income tax, perjury, and treason.

**The Big Fish**

Two U.S. presidents have been impeached: Andrew Johnson, the seventeenth chief executive, and William J. Clinton, the forty-second.

Johnson, a Southern Democrat who became president after Lincoln's assassination, supported a mild policy of Reconstruction after the Civil War. The Radical Republicans in Congress were furious at his leniency toward ex-Confederates and obvious lack of concern for ex-slaves, demonstrated by his veto of civil rights bills and opposition to the Fourteenth Amendment. To protect Radical Republicans in Johnson's administration and diminish the strength of the president, Congress passed the Tenure of Office Act in 1867, which prohibited the president from dismissing office holders without the Senate's approval. A defiant Johnson tested the constitutionality of the Act by attempting to oust Secretary of War Edwin M. Stanton. His violation of the Act became the basis for impeachment in 1868. But the Senate was one vote short of the two-thirds majority needed to convict, and Johnson was acquitted May 26, 1868.

Senator Charles Sumner, witness to the proceedings, defined them as "political in character." Historians today generally agree with his assessment and consider the grounds for Johnson's impeachment flimsy—the Tenure of Office Act was partially repealed in 1887,and then declared unconstitutional in 1926.

Bill Clinton was ultimately dragged down—though not defeated—by the character issues brought into question even before his election. An investigation into some suspect real estate dealings in which Clinton was involved prior to his presidency failed to turn up any implicating evidence. However, Independent Counsel Kenneth Starr managed to unravel a tangled web of alleged sexual advances and affairs in Clinton's past. The trail led to former White House intern Monica S. Lewinsky. After months of denials, including in a videotaped legal testimony, Clinton admitted in August of 1998 that he had had a sexual relationship with the young woman during the time of her internship.

**RELATED LINKS**

**Presidential Factfile**

**Inaugural Factfile**

**The Cabinet of George W. Bush**

**Inaugural Oratory**

**Presidential Inaugural Addresses**

**Presidential Inaugural Addresses: Length and Date of Speech**

**How is a President Nominated and Elected**

The infamous "Starr Report" outlining the findings of the Independent Counsel's investigation was delivered to the House of Representatives on Sept. 9, 1998, and subsequently made available to the public. Many felt the report, filled with lurid details of Clinton's sexual encounters with Lewinsky, to be a political attack against the President rather than a legal justification for his impeachment. Of the 11 possible grounds for impeachment cited by Starr, four were eventually approved by the House Judiciary Committee: grand jury perjury, civil suit perjury, obstruction of justice, and abuse of power.

> **Many felt the Starr Report, filled with lurid details of Clinton's sexual encounters with Lewinsky, to be a political attack against the President rather than a legal justification for his impeachment.**

On December 19, following much debate over the constitutionality of the proceedings and whether or not Clinton could be punished by censure rather than impeachment, the House of Representatives held its historic vote. Clinton was impeached on two counts, grand jury perjury (228–206) and obstruction of justice (221–212), with the votes split along party lines. The Senate Republicans, however, were unable to gather enough support to achieve the two-thirds majority required for his conviction. On Feb. 12, 1999, the Senate acquitted President Clinton on both counts. The perjury charge failed by a vote of 55–45, with 10 Republicans voting against impeachment along with all 45 Democrats. The obstruction of justice vote was 50-50, with 5 Republicans breaking ranks to vote against impeachment.

Impeachment - History

**The One That Got Away**

Of thirty-five attempts at impeachment, only nine have come to trial. Because it cripples Congress with a lengthy trial, impeachment is infrequent. Many officials, seeing the writing on the wall, resign rather than face the ignominy of a public trial.



The most famous of these cases is of course that of President Richard Nixon, a Republican. After five men hired by Nixon's reelection committee were caught burglarizing Democratic party headquarters at the Watergate Complex on June 17, 1972, President Nixon's subsequent behavior—his cover-up of the burglary and refusal to turn over evidence—led the House Judiciary Committee to issue three articles of impeachment on July 30, 1974. The document also indicted Nixon for illegal wiretapping, misuse of the CIA, perjury, bribery, obstruction of justice, and other abuses of executive power. "In all of this," the Articles of Impeachment summarize, "Richard M. Nixon has acted in a manner contrary to his trust as president and subversive of constitutional government, to the great prejudice of the cause of law and justice, and to the manifest injury of the people of the United States." Impeachment appeared inevitable, and Nixon resigned on Aug. 9, 1974. The Articles of Impeachment, which can be viewed at http://vcepolitics.com/wgate.htm, leave no doubt that these charges qualify as "high crimes and misdemeanors," justifying impeachment.

*Source:* Library of Congress Picture Collection

---

**Current Features | Spotlight Archive | Daily Almanac**

**Did you know?**  Redwoods, descendants of the giant evergreen trees that grew during the age of the dinosaurs, take 400 years to fully mature.

---

© 2001-2002. Family Education Network, Inc. All rights reserved



EXHIBIT

C



Free Cash
for your
kid's school!
FIND OUT HOW!
schoolcash.com

News
Weather
Horoscopes



infoplease.com
all the knowledge you need

Almanacs
Dictionary
Encyclopedia
Atlas

search [        ] in [All Infoplease ▾] go!

Home
Daily Almanac

History and Government—U.S. Presidents—Biographies of the Presidents

Trace your family
history with
Ancestry.com

World
United States
History & Gov't
Biography
Sports
Entertainment
Business
Society & Culture
Health & Science
Weather

Homework Center
Fact Monster

FREE



## Richard Milhous Nixon

**Born:** 1/9/1913
**Birthplace:** Yorba Linda, Calif.

**Richard Milhous Nixon** was born in Yorba Linda, Calif., on Jan. 9, 1913, to Midwestern-bred parents, Francis A. and Hannah Milhous Nixon, who raised their five sons as Quakers.

Nixon was a high school debater and was undergraduate president at Whittier College in California, where he was graduated in 1934. As a scholarship student at Duke University Law School in North Carolina, he graduated third in his class in 1937.



Search Biographies
[        ] go!

Sources:
Atlas
Almanacs
Encyclopedia
Dictionary

E-mail this page

HotWords
Highlight any
word, then click
the HotWords®
button for more
info

Get FactFinder:
free reference
center for your
desktop

Newsletter

Site Map  New!

After five years as a lawyer, Nixon joined the Navy in August 1942. He was an air transport officer in the South Pacific and a legal officer stateside before his discharge in 1946 as a lieutenant commander.

Running for Congress in California as a Republican in 1946, Nixon defeated Rep. Jerry Voorhis. As a member of the House Un-American Activities Committee, he made a name as an investigator of Alger Hiss, a former high State Department official, who was later jailed for perjury. In 1950, Nixon defeated Rep. Helen Gahagan Douglas, a Democrat, for the Senate. He was criticized for portraying her as a Communist dupe.

BRAND
NAME
SOFTWARE OF
YOUR CHOICE

Education
Technology
Science
More Choices
go

Nixon's anti-Communism ideals, his Western roots, and his youth figured into his selection in 1952 to run for vice president on the ticket headed by Dwight D. Eisenhower. Demands for Nixon's withdrawal followed disclosure that California businessmen had paid some of his Senate office expenses. His televised rebuttal, known as "the Checkers speech" (named for a cocker spaniel given to the Nixons), brought him support from the public and from Eisenhower. The ticket won easily in 1952 and again in 1956.



infoplease.com

Eisenhower gave Nixon substantive assignments, including missions to 56 countries. In Moscow in 1959, Nixon won acclaim for his defense of U.S. interests in an impromptu "kitchen debate" with Soviet Premier Nikita S. Khrushchev.

AutoGuide




Nixon lost the 1960 race for the presidency to John F. Kennedy.

In 1962, Nixon failed in a bid for California's governorship and seemed to be finished as a national candidate. He became a Wall Street lawyer, but kept his old party ties and developed new ones through constant travels to speak for Republicans.

Nixon won the 1968 Republican presidential nomination after a shrewd primary campaign, then made Gov. Spiro T. Agnew of Maryland his surprise choice for vice president. In the election, they edged out the Democratic ticket headed by Vice President Hubert H. Humphrey by 510,314 votes out of 73,212,065 cast.

Committed to winding down the U.S. role in the Vietnamese War, Nixon pursued "Vietnamization"—training and equipping South Vietnamese to do their own fighting. American ground combat forces in Vietnam fell steadily from 540,000 when Nixon took office to none in 1973 when the military draft was ended. But there was heavy continuing use of U.S. air power.

Nixon improved relations with Moscow and reopened the long-closed door to mainland China with a good-will trip there in February 1972. In May of that year, he visited Moscow and signed agreements on arms limitation and trade expansion and approved plans for a joint U.S.–Soviet space mission in 1975.

Inflation was a campaign issue for Nixon, but he failed to master it as president. On Aug. 15, 1971, with unemployment edging up, Nixon abruptly announced a new economic policy: a 90-day wage-price freeze, stimulative tax cuts, a temporary 10% tariff, and spending cuts. A second phase, imposing guidelines on wage, price, and rent boosts, was announced October 7.

The economy responded in time for the 1972 campaign, in which Nixon played up his foreign-policy achievements. Played down was the burglary on June 17, 1972, of Democratic national headquarters in the Watergate apartment complex in Washington. The Nixon–Agnew re-election campaign cost a record $60 million and swamped the Democratic ticket headed by Senator George McGovern of South Dakota with a plurality of 17,999,528 out of 77,718,554 votes. Only Massachusetts, with 14 electoral votes, and the District of Columbia, with 3, went for McGovern.

In January 1973, hints of a cover-up emerged at the trial of six men found guilty of the Watergate burglary. With a Senate investigation under way, Nixon announced on April 30 the resignations of his top aides, H. R. Haldeman and John D. Ehrlichman, and the dismissal of White House counsel John Dean III. Dean was the star witness at televised Senate hearings that exposed both a White House cover-up of Watergate and massive illegalities in Republican fund-raising in 1972.

The hearings also disclosed that Nixon had routinely tape-recorded his office meetings and telephone conversations.

On Oct. 10, 1973, Agnew resigned as vice president, then pleaded no-contest to a negotiated federal charge of evading income taxes on alleged bribes. Two

Michigan, as the new vice president. Congress confirmed Ford on Dec. 6, 1973.

In June 1974, Nixon visited Israel and four Arab nations. Then he met in Moscow with Soviet leader Leonid I. Brezhnev and reached preliminary nuclear arms limitation agreements.

But, in the month after his return, Watergate ended the Nixon regime. On July 24 the Supreme Court ordered Nixon to surrender subpoenaed tapes. On July 30, the Judiciary Committee referred three impeachment articles to the full membership. On August 5, Nixon bowed to the Supreme Court and released tapes showing he halted an FBI probe of the Watergate burglary six days after it occurred. It was in effect an admission of obstruction of justice, and impeachment appeared inevitable.

Nixon resigned on Aug. 9, 1974, the first president ever to do so. A month later, President Ford issued an unconditional pardon for any offenses Nixon might have committed as president, thus forestalling possible prosecution.

In 1940, Nixon married Thelma Catherine (Pat) Ryan. They had two daughters, Patricia (Tricia) and Julie, who married Dwight David Eisenhower II, grandson of the former president.

He died on April 22, 1994, in New York City of a massive stroke.

**Died:** 4/22/1994



Lyndon Baines Johnson    Biographies of the Presidents    Gerald Rudolph Ford

Print this page    Email this page    Cite this page

Search Infoplease
[_____] Go!

Search Biographies
[_____] Go!
Biography search tips

Link to Infoplease

Add Infoplease **search** to your site

Search the Web with **Ask Jeeves**

Company | Contact us | Advertise on infoplease.com
Privacy | Terms of Use | Help | Site Map

© 2000-2002 Family Education Network, Inc. All rights reserved

**Key Dates**

November 1992 William Jefferson Clinton elected President of the United States

May 1994 Paula Jones files lawsuit against President Clinton

July 1995 Monica S. Lewinsky begins White House internship

November 15, 1995 President begins sexual relationship with Lewinsky

April 5, 1996 Lewinsky transferred from White House to Pentagon

November 1996 President Clinton reelected

March 29, 1997 Last intimate contact between President and Monica Lewinsky

December 5, 1997 Lewinsky appears on Jones Witness List

December 19, 1997 Lewinsky served with subpoena to appear at deposition and produce gifts from President Clinton

December 24, 1998 Lewinsky's last day of work at the Pentagon

December 28, 1997 Lewinsky meets with the President and receives gifts; later gives box of gifts from the President to Betty Currie.

January 7, 1998 Lewinsky signs affidavit intended for filing in Jones case.

January 13, 1998 Lewinsky accepts job offer at Revlon in New York

January 16, 1998 Special Division appoints Independent Counsel Kenneth W. Starr to investigate Lewinsky matter

January 17, 1998 President deposed in Jones case

January 18, 1998 President meets with Betty Currie to discuss President's deposition

January 21, 1998 Lewinsky matter reported in press; President denies allegations of a sexual relationship and of suborning perjury

April 1, 1998 Judge Wright grants summary judgment for President Clinton in the Jones litigation

July 17, 1998 President served with grand jury subpoena, later withdrawn in return for testimony

July 28, 1998 Immunity/Cooperation Agreement reached between Lewinsky and OIC

August 17, 1998 President testifies before the grand jury; later he publicly acknowledges improper relationship

September 9, 1998 OIC submits Referral to Congress pursuant to 28 U.S.C. § 595(c)



ADDENDUM

LEXSEE 2000 us app lexis 33466

**RAFAEL DEITZ GROSWIRT; GEORGE A. LAGUTA, Plaintiffs-Appellants, v. COLUMBUS DISPATCH, et al., Defendants-Appellees.**

No. 00-3451

**UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT**

*2000 U.S. App. LEXIS 33466; 29 Media L. Rep. 1223*

**December 13, 2000, Filed**

**NOTICE:**

[*1] NOT RECOMMENDED FOR FULL-TEXT PUBLICATION. SIXTH CIRCUIT RULE 28(g) LIMITS CITATION TO SPECIFIC SITUATIONS. PLEASE SEE RULE 28(g) BEFORE CITING IN A PROCEEDING IN A COURT IN THE SIXTH CIRCUIT. IF CITED, A COPY MUST BE SERVED ON OTHER PARTIES AND THE COURT. THIS NOTICE IS TO BE PROMINENTLY DISPLAYED IF THIS DECISION IS REPRODUCED.

**SUBSEQUENT HISTORY:**

Reported in Table Case Format at: *2000 U.S. App. LEXIS 36171.*

**PRIOR HISTORY:**

Southern District of Ohio. 99-00263. Graham. 2-28-00.

**DISPOSITION:**

Motion to produce records denied and the district court's judgment affirmed.

**COUNSEL:**

RAFAEL DEITZ GROSWIRT, Plaintiff - Appellant, Pro se, Mansfield, OH.

GEORGE A. LAGUTA, Plaintiff - Appellant, Pro se, Mansfield, OH.

For COLUMBUS DISPATCH, Defendant - Appellee: Marion H. Little, Jr., Stuart G. Parsell, Zeiger & Carpenter, Columbus, OH.

**JUDGES:**

Before: MARTIN, Chief Judge; GUY and COLE, Circuit Judges.

**OPINION:**

ORDER

Rafael Deitz Groswirt and George A. Laguta, proceeding pro se, appeal a district court judgment dismissing their civil action filed pursuant to *42 U.S.C. § § 1981,* 1982, 1983, 1985, and 1991 and the Sherman Antitrust Act, *15 U.S.C. § § 1* and 2. This case has been referred to a panel of the court pursuant to Rule 34(j)(1), Rules of the Sixth [*2] Circuit. Upon examination, this panel unanimously agrees that oral argument is not needed. Fed. R. App. P. 34(a).

Seeking declaratory, injunctive, equitable, and monetary relief, Groswirt and Laguta ("plaintiffs") filed a complaint against The Columbus Dispatch ("Dispatch"), a newspaper, and Veronica Hill, legal advertising representative for the Dispatch. The plaintiffs alleged that on December 16, 1998, they submitted letters addressed to former Ohio Governor George V. Voinovich to the Dispatch for publication. On December 24, 1998, the plaintiffs received a letter from Hill, which stated that the Dispatch would not publish their letters because "we do not accept ads of this nature." The plaintiffs contended that Hill's statement indicated that the Dispatch refused to publish their letters because of their "racial; heritage; political; religious;" status and because they are both currently incarcerated in an Ohio prison. The plaintiffs state that their race is "Mexican-Israeli; Russian" and that

their religion is "Jewish; Russian Orthodox." The plaintiffs sought relief under § 1983 for violations of the First, Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States [*3] Constitution and *15 U.S.C. § § 1* and 2. In an amended complaint, the plaintiffs indicated that they meant to file their suit pursuant to the provisions of *42 U.S.C. § § 1981, 1982, 1985, and 1991*, but due to a clerical error, had listed only § 1983 in the original complaint.

The defendants filed a motion to dismiss the complaints for failure to state a claim upon which relief may be granted pursuant to Fed. R. Civ. P. 12(b)(6). A magistrate judge filed a report recommending that the defendants' motion be granted. Over the plaintiffs' objections, the district court adopted the magistrate judge's report and recommendation and dismissed the complaint. The district court subsequently denied the plaintiffs' Fed. R. Civ. P. 60(b) motion for relief from judgment. The plaintiffs have filed a timely appeal. In addition, the plaintiffs filed a motion requesting the defendants to produce records held by prison officials. The defendants have responded to the plaintiffs' motion.

Initially, we note that the plaintiffs do not appeal the disposition of their claims filed pursuant to *42 U.S.C. § § 1982, 1983, 1985, 1991* and *15 U.S.C. § § 1* [*4] and 2. Instead, the plaintiffs' appellate brief challenges only the propriety of the district court's dismissal of their *42 U.S.C. § 1981* claim. Issues which were raised in the district court, yet not raised on appeal, are considered abandoned and not reviewable on appeal. *See Boyd v. Ford Motor Co., 948 F.2d 283, 284 (6th Cir. 1991)*. Consequently, the only issue before us is the propriety of the district court's disposition of the § 1981 claim.

We review de novo a district court's dismissal of a suit pursuant to Fed. R. Civ. P. 12(b)(6). *See Decker v. Merrill Lynch, Pierce, Fenner and Smith, Inc., 205 F.3d 906, 909 (6th Cir. 2000); Columbia Natural Res., Inc. v. Tatum, 58 F.3d 1101, 1109 (6th Cir. 1995)*. When considering a Fed.

R. Civ. P. 12(b)(6) motion to dismiss, "the district court must construe the complaint in a light most favorable to the plaintiff, accept all of the factual allegations as true, and determine whether the plaintiff undoubtedly can prove no set of facts in support of his claims that would entitle him to relief." *Tatum, 58 F.3d at 1109; accord Decker, 205 F.3d at 909.* [*5]

Upon review, we conclude that the district court properly dismissed the plaintiffs' complaint for failure to state a claim for relief. *See Decker, 205 F.3d at 909.* A private publication has a First Amendment free press right to refuse to print material submitted to it for publication. *See Miami Herald Publ'g Co. v. Tornillo, 418 U.S. 241, 255-58, 41 L. Ed. 2d 730, 94 S. Ct. 2831 (1974); Johari v. Ohio State Lantern, 1996 U.S. App. LEXIS 3461, No. 95-3421, 1996 WL 33230, at *1 (6th Cir. Jan. 26, 1996)* (unpublished order). For this reason, a federal court cannot compel a newspaper to print an article submitted to it by a citizen. *See Miami Herald Publ'g Co., 418 U.S. at 255-56; Cook v. Advertiser Co., 458 F.2d 1119, 1123-24 (5th Cir. 1972)* (Wisdom, J., concurring). Because the Dispatch cannot be compelled by a federal court to publish the plaintiffs' letters and cannot be ordered to pay damages to the plaintiffs for the failure to publish their letters, the plaintiffs' complaint fails to state a claim for relief.

Furthermore, the plaintiffs' complaint does not allege the existence of a contract between the plaintiffs and the [*6] Dispatch. The complaint also fails to sufficiently allege racial discrimination. Moreover, in light of the Dispatch's First Amendment free press right, it is clear that neither white citizens nor non-white citizens have a contractual right to have material published by a newspaper. *See Cook, 458 F.2d at 1124* (Wisdom, J., concurring).

Accordingly, the motion to produce records is denied and the district court's judgment is affirmed. Rule 34(j)(2)(C), Rules of the Sixth Circuit.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
### CLARKSBURG DIVISION

**ROBERT HART**,

      Plaintiff,

v.                                                                    CIVIL ACTION NO. 1:02cv73

**THE CHRISTIAN BROADCASTING
NETWORK, INC., AMERICAN CENTER
FOR LAW AND JUSTICE, INC., JON
GIGLIOTTI,** individually, and **JOHN
STEPANOVICH,** individually,

      Defendants.

---

## CERTIFICATE OF SERVICE

      I, April Min, do hereby certify that I served the foregoing **"MOTION TO DISMISS ON BEHALF OF DEFENDANTS THE CHRISTIAN BROADCASTING NETWORK, INC., AMERICAN CENTER FOR LAW AND JUSTICE, INC., AND JOHN STEPANOVICH"** and **"MEMORANDUM IN SUPPORT OF MOTION TO DISMISS ON BEHALF OF DEFENDANTS THE CHRISTIAN BROADCASTING NETWORK, INC., AMERICAN CENTER FOR LAW AND JUSTICE, INC., AND JOHN STEPANOVICH"** upon the following, by mailing a copy thereof by United States Postal Service, postage prepaid, this _29th_ day of July, 2002.

          Robert Hart
          58 St. Clairs Village
          Morgantown, WV 26505
          *Pro Se*

          April Min, Esquire
          WV State Bar I.D. No. 7750

M0370502.1